Tai Sports, Inc. v. Hall, 2012 NCBC 62.

STATE OF NORTH CAROLINA

COUNTY OF GASTON

TAI SPORTS, INC.,

      Plaintiff,

vs.

JEFFREY LEE HALL, TRACI HALL, JEFF
HALL SPORTS, INC., JEFFREY LEE HALL
d/b/a "WORTH SPORTS," "BAT-R-UP," "WSL,"
and/or "JEFF HALL GRAPHICS," TKL
ELECTRICAL SERVICES, INC., C.H. & SONS
CONSTRUCTION, INC., BRANDON ROBERTS
RODNEY WALKER  a/k/a crestchargers13@
yahoo.com, MIKE CALDWELL, TRACI P.
BRADLEY, SHELLY A. ("MOE") NEAL,
ANDREW BENFIELD, and DEWEY
McKINNEY, ,

      Defendants.

AND

JEFFREY LEE HALL, JEFF HALL SPORTS,
INC., C.H. & SONS CONSTRUCTION, INC.,
TKL ELECTRICAL SERVICES, INC., and
MIKE CALDWELL,

      Counterclaimants,

vs.

CARLOS G. VEGA, VEGA REAL ESTATE
HOLDINGS, LLC and TAI SPORTS, INC.,

      Counterclaim Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 2201

ORDER & FINAL JUDGMENT

*Gray, Layton, Kersh, Solomon, Furr & Smith, P.A., by William E. Moore, Jr.
for Plaintiff/Counterclaim Defendant TAI Sports, Inc.; and Counterclaim
Defendants Carlos G. Vega and Vega Real Estate Holdings, LLC.*

*Baucom, Claytor, Benton, Morgan & Wood, P.A., by Rex C. Morgan for Defendants Jeffrey Lee Hall individually and d/b/a Worth Sports, LLC; Bat-R-Up; WSL; Jeffery Hall Graphics; TKL Electrical Services, Inc.; C.H. & Sons Construction, Inc.; Traci Hall; Mike Caldwell; Rodney Walker; and Jeff Hall Sports, Inc.*

*Brandon Roberts, Traci P. Bradley, Dewey McKinney, and Shelly A. ("Moe") Neal appearing pro se.*

Murphy, Judge.

I.

STATEMENT OF THE CASE

{1} **THIS MATTER** came before the Court for trial without a jury during the April 4, 2011, term of civil Superior Court in Gaston County. In its 40-page Amended Complaint filed May 21, 2009, Plaintiff alleges seventeen (17) claims for relief: (1) preliminary and permanent injunctive relief, (2) demand for accounting,[1] (3) declaratory judgment, (4) breach of contract, (5) fraud, (6) breach of fiduciary duty and constructive trust, (7) constructive trust in favor of Plaintiff, (8) conversion of personal property, (9) unfair and deceptive trade practices, (10) unjust enrichment, (11) quantum meruit for rent on implied lease, (12) trespass, (13) trespass to personal property, (14) civil conspiracy, (15) nuisance, (17) tortious interference with business relations and the prospective economic advantage of Plaintiff, and (18) punitive damages.[2]

{2} Plaintiff dismissed with prejudice all claims against Defendant Ted W. Harris on March 15, 2011. Although Plaintiff had previously dismissed with prejudice all claims against Defendant Andrew Benfield ("Benfield") on May 21, 2009, Benfield appeared as a witness and testified during the trial of this case.

{3} Beginning April 4, 2011, and concluding June 3, 2011, the Court received evidence, including 311 Exhibits, and sworn testimony from twenty (20) witnesses (live, by deposition, and by video conferencing), including three (3) expert witnesses. What was represented by the parties to be a three (3) week bench trial morphed

---

[1] The Court denied Plaintiff's demand for accounting by its order entered on June 25, 2009. *TAI Sports, Inc. v. Hall*, No. 09 CVS 2201 (N.C. Super. Ct. June 25, 2009) (order denying Plaintiff's Motion for Preliminary Injunction).

[2] The Amended Complaint does not include a claim denominated (16).

into a tedious eight-week presentation of evidence, principally by Plaintiff, that tended more to obscure the salient facts of the case rather than enlighten the Court. Nonetheless, after an inordinately time-consuming, arduous, and painstaking consideration of the record, the evidence presented, and the arguments and contentions of counsel and the parties, the Court makes the following:

II.

FINDINGS OF FACT

A.

BACKGROUND

{4} In 2005, Carlos Vega ("C. Vega"), a citizen and resident of the state of California, formed TAI Sports, Inc., ("TAI"), a California corporation, which he has owned and operated since 2005.

{5} At all relevant times, TAI's operation was physically located at 446 West Meats Avenue in Orange, California. C. Vega was the owner and President of TAI, and his brother, Jose Vega ("J. Vega"), was Vice-President. TAI had two office workers who processed virtually all orders and sales of sporting products coming through the California office, Elizeth "Elly" Armenta and Lupe' Ramirez. In addition to TAI, C. Vega owned and operated Turbine Airmotive, Inc, a separate California corporation also supported by J. Vega, Elly Armenta, and Lupe' Ramirez.

{6} During the first quarter of 2006, TAI developed a product line of "Elite" brand sports apparel initially consisting of bat bags and "Turf" shoes. The brand eventually developed into a more complete line of sporting apparel that included shirts, pants, hats, uniforms, etc.

{7} Defendant Jeffrey Lee Hall ("Hall"), a citizen and resident of Gastonia, North Carolina, is a well-known, amateur softball player who has numerous batting titles and was the first active player inducted into the United States Specialty Sports Association (USSSA) Slow Pitch Softball Hall of Fame in 2006. Hall describes himself as "the most recognizable name in the game of amateur softball."

{8} Before meeting C. Vega, Hall had enjoyed endorsement contracts with several different sporting goods equipment and apparel manufacturers, including

Worth Sports, LLC ("Worth").  At the time Hall met C. Vega, Hall was sponsored by Worth and was an authorized seller of Worth bats.  Worth paid Hall a salary, plus expenses, and a percentage of revenue from the sale of "Jeff Hall" signature bats sold by Worth.  In 2006, Hall also had a personal account with Worth to occasionally sell bats for himself, but he was not in the business of selling bats until 2007.

{9}   In addition to his softball activities, Hall was a minority owner of C.H. & Sons Construction, Inc. ("C.H. & Sons"), a North Carolina corporation that he started in June 2005 with Defendant Mike Caldwell ("Caldwell") and William Cooper (not a party to this action).  Hall also owned a majority interest in Defendant TKL Electrical Services, Inc. ("TKL").  William Cooper was a minority owner of TKL until his interest was purchased by C.H. & Sons during the course of an unrelated, internal company dispute.

{10} Defendant Traci Hall ("T. Hall") is the wife of Defendant Hall.  T. Hall is the majority owner of C.H. & Sons and, from the inception of the business, has served as its bookkeeper.  T. Hall also performed bookkeeping services for TKL and various other Hall entities, and managed her family's personal financial affairs.  T. Hall worked principally from an office over the garage of the Halls' residence at 2004 Tomshire Drive, Gastonia, North Carolina.

B.

PROMOTIONAL ARRANGEMENT BETWEEN TAI AND JEFF HALL

{11} In September 2006, Mike Turney, a Worth representative, introduced C. Vega to Hall at the 2006 Softball World Series in Orlando, Florida.  After becoming aware of Hall's prowess and notoriety as a star softball player, C. Vega asked Hall to wear and promote TAI's "Elite" brand products (turf shoes, dry-fit shirts, bags and jackets) during Hall's softball appearances around the country.  C. Vega did not have any samples with him.  About a week after meeting Hall, C. Vega called Hall and arranged to have several pair of "Elite" turf shoes delivered to Hall's home address.

{12} Hall was receptive to the arrangement and agreed to wear and promote "Elite" products.  The parties did not enter into a formal written agreement, but

agreed that Hall would receive free TAI "Elite" brand products to wear for promotional purposes at softball tournaments and appearances, and that TAI could use Hall's name to promote its products.

{13} As the relationship developed, TAI paid expenses associated with Hall's participation in high-level softball tournaments and events, including sponsorship of the "Long Haul Bombers Tour", the World Softball League ("WSL") and the U.S. Slow Pitch Softball Association ("USSSA"). TAI obtained Worth's permission for Hall to promote "Elite" products. As agreed, Hall wore and promoted "Elite" products at several hitting exhibitions that he participated in around the country. The relationship between C. Vega and Hall evolved over time by way of verbal and electronic communications between themselves, and via personal interactions, until March 2009.

{14} Neither C. Vega nor TAI provided Hall with any guidelines or limitations regarding the use, sale, or distribution of promotional items. Hall had discretion to give away or to sell below cost TAI's products for promotional purposes. Although TAI complains that Hall was excessive in giving away promotional items and providing steep discounts to customers, by default TAI left those decisions regarding promotional goods entirely to the discretion and judgment of Hall (Exhibit 147-I, p.168, L18–25).

{15} Hall maintains that the only merchandise C. Vega sent to him in October and November 2006, was sample packages sent to Hall personally, and that Hall never sold merchandise from his home.

{16} According to C. Vega, he and Hall talked by telephone in September or October 2006. Hall was going to a tournament and requested that C. Vega send him "Elite" products to sell. Hall did not say what or how much merchandise to send. C. Vega presented shipping manifests for approximately 220 packages of TAI merchandise, each package weighing between twenty-two (22) and forty-eight (48) pounds, shipped via Federal Express from TAI to Jeff Hall, 116 Hunter Lane, Gastonia, North Carolina on or about October 12, 2006. (Plaintiff's Exhibit 155-P - Federal Express shipping records). As of November 4, 2006, the amount due to

Federal Express for shipping was overdue. C. Vega also presented Plaintiff's Exhibit 155-P1 (Invoice #8-479-58875 dated October 20, 2006, in the amount of $55,750.00) which tends to confirm his assertion that merchandise was shipped to Hall. Hall denied receiving the merchandise, and did not account for any sale proceeds. From the evidence presented, the Court finds C. Vega's testimony to be credible regarding the shipment of merchandise to Hall.

{17} C. Vega acknowledges that he and Hall never discussed: (a) Hall's responsibilities with respect to the merchandise, (b) how the invoice was to be paid, or (c) what Hall's share of the sales proceeds would be. C. Vega expected Hall to be honest and fair with him and to pay him for the products, but C. Vega never communicated those expectations to Hall.

C.

THE EAST COAST DISTRIBUTION CENTER (ECDC)

{18} In October 2006, C. Vega informed Hall that he was looking for a place on the east coast to open a warehouse and distribute "Elite" products, and wanted to know if Hall was aware of any warehouse space available in the Gastonia area. Hall informed C. Vega about warehouse spaces for sale on New Hope Road in Gastonia. In November 2006, C. Vega traveled to Gastonia to look at spaces, and after visiting two locations, he purchased a warehouse at 3400 New Hope Road, Gastonia, North Carolina from the Lakhany family.

{19} While in Gastonia, C. Vega opened a bank account at Citizens South Bank for the TAI East Coast Distribution Center ("ECDC"), and made Hall a signatory on the account. Hall agreed to deposit funds in the account from monies he earned from selling TAI products that had been shipped to him. Hall and C. Vega never reduced their arrangement to writing and both men testified about different understandings with respect to Hall's role in the ECDC.

{20} In addition to promoting "Elite" products, Hall understood that he was acting only as C. Vega's friend by agreeing to: (a) oversee the operation of the ECDC, (b) help with the hiring and management of personnel, (c) oversee the

maintenance of the facility, and (d) manage the collection and deposit of rents from tenants of 3400 New Hope Road. According to Hall, C. Vega promised to give Hall a share of the profit from the sale of the warehouse at some unspecified future time.

{21} C. Vega, on the other hand, described an arrangement whereby Hall would be responsible for: (a) overseeing and operating the ECDC; and (b) signing checks less than $10,000 for TAI-related business operations (checks over $10,000 required two signatures). According to C. Vega, Hall would be rewarded for his efforts if and when C. Vega sold the warehouse. But, no discussion or agreement was reached on the specific amount, share, or nature of reward that Hall would receive. In addition to a share from the sale of the warehouse, C. Vega testified that Hall would receive free "Elite" brand products to wear, promote, and sell for his own benefit.

{22} C. Vega acknowledges that Hall was not hired initially as an employee of TAI or the ECDC because C. Vega could not afford to pay Hall a salary. However, according to C. Vega, in exchange for Hall agreeing to operate and manage the ECDC, Hall would receive free TAI products to wear while promoting TAI, and TAI would bring Hall on as a full-time employee when C. Vega could afford to pay Hall a salary comparable to Hall's earnings from C.H. & Sons. According to C. Vega, this arrangement constitutes the foundation of the parties' agreement upon which this lawsuit is based, even though no specific duties were discussed or assigned to Hall as the manager of the ECDC.

{23} C. Vega purchased the property at 3400 South New Hope Road in June 2007, in the name of Vega Real Estate Holdings, LLC ("Vega Real Estate"), a company owned in equal shares by C. Vega and his wife. The total warehouse space was divided into three separate parcels (A, B and C). Between January and June 2007, TAI leased Parcel B from the owner, Cougar, Inc. (the Lakhany's business). After the purchase, C. Vega leased Parcel A of the warehouse to Cougar, Inc., TAI occupied Parcel B, and Parcel C remained subject to a pre-existing lease with an unrelated business.

{24} C. Vega did not make inquiries into Hall's background and experience, or Hall's ability to do the things C. Vega expected of him, before entrusting Hall with

the Gastonia checking account, the management and operation of the ECDC, and the hiring of employees.  C. Vega testified that he thought he could trust Hall because Hall was the poster child for a $100 million dollar company (Worth) and because C. Vega knew Hall's reputation in the softball world was superb.

{25} In March 2007, Hall hired his cousin, Tammy Hall Smith ("Smith"), to help in the ECDC 2–3 days per week taking orders, shipping product, and doing general office work.  At that time, there was a shipping computer in the warehouse, but Smith used an excel spread sheet to enter and keep track of product inventory.  All sales were recorded on slips of paper that Smith retained.  Within a few months, Smith visited the QuickBooks internet website, researched the product and purchased a QuickBooks computer bookkeeping program from Office Depot for the ECDC's office.  Smith later purchased an updated version of QuickBooks because it was a better product for distribution and warehouse purposes and allowed her to keep up with inventory more efficiently.  Smith had no prior experience with QuickBooks before she purchased the program for the ECDC, and taught herself to use the program without help from anyone at TAI.  No one from TAI's California office ever inquired about the ECDC QuickBooks program, or sent anyone to review the QuickBooks program or files, while Smith was employed.

{26} Smith's responsibilities grew to include writing checks for accounts payable, supplies, and temporary help wages.  Smith wrote checks from the TAI bank account and Hall signed them, although she recalled signing Hall's name to a few checks if Hall was out of town and accounts needed to be paid.  Smith received no training or instructions from Hall, C. Vega, or any other employee or representative of TAI regarding shipping, receiving, bookkeeping, or other duties necessary for the operation of a warehouse facility.  While employed with TAI, Smith entered sales orders and made financial entries into the QuickBooks program.  Andrew Benfield ("Benfield") and Linda Ratchford were the only other individuals who entered sales orders into the system.  While Smith was an employee of TAI, no products entered or left the warehouse without being accounted for and documented in QuickBooks.

{27} During the summer of 2007, Smith entered into QuickBooks all of the data from the Excel spreadsheet she had been using, and transferred into the computer program all product sales from the slips of paper she had maintained. Smith also participated in an inventory of TAI products at the ECDC in October 2007. By that time, all historical inventory and sales had been entered into the QuickBooks program. Smith remained in her position until she quit in mid-April 2008.

{28} From April 18 through May 22, 2008, T. Hall served as the interim office manager for the ECDC until a permanent office manger was hired. T. Hall also provided occasional assistance and training to Smith, and later Traci Bradley ("Bradley") on QuickBooks. To better facilitate the training of TAI employees, in January 2009, T. Hall was provided an electronic copy of TAI's QuickBooks. T. Hall was also given access to the ECDC's computer and entered or recorded transactions in both the ECDC's QuickBooks program and the financial books and records of Hall's other businesses.

{29} In fall 2007, Hall hired Benfield to help Moe Neal with shipping and receiving, unloading trucks, and stocking the ECDC warehouse with "Elite" products. After a few months in the warehouse, Benfield began processing orders in the office with Smith. Benfield made entries in QuickBooks, but had no prior experience with the program. Most of the work Benfield did involved processing California orders and doing business with "Elite" representatives, although he also sold retail from the ECDC to customers. At all times, Benfield understood he was an employee of TAI, but worked under Hall. For day-to-day matters, whenever Benfield had questions about work, he took them to Smith.

{30} From time to time, Benfield would go over to C.H. & Sons to see Hall about a question. If Hall was not available, Benfield would email C. Vega or one of his employees in California. On occasion, Benfield called C. Vega directly with questions.

{31} After Hall purchased a printer and some presses for the ECDC, Benfield used the equipment to print and press "Elite" shirts that were sold as TAI products. In January 2009, Benfield began working with Dewey McKinney ("McKinney") in

the offices of C.H. & Sons doing printing and graphics work for "Elite" products, among other things. Benfield understood that McKinney was also an employee of TAI. Benfield remained an employee of TAI until March 3, 2009.

{32} On April 16, 2008, Hall hired Bradley to replace Smith as the ECDC office manager. Bradley had a clerical background, but no experience with bookkeeping or with QuickBooks. Bradley served as the ECDC's office manager and managed the company's books and records, including its QuickBooks accounting software, with assistance from T. Hall and Melissa Simons ("Simons"). T. Hall assisted with training Bradley to enter transactions in QuickBooks, maintain inventory records, prepare invoices for the sale of TAI products, enter invoices from California, pay bills, maintain the checkbook register in QuickBooks, and do general office work.

{33} Hall hired Simons, a bookkeeper, to help Bradley with the books and records. Prior to March 3, 2009, Bradley also performed services, and conducted electronic transactions, for "Jeff Hall Sports Sales Division" and "Jeff Hall Sports" while an employee of TAI. But Angie Crisp, an employee of C.H. & Sons, worked on QuickBooks for Jeff Hall Sports. If Bradley had questions about her work, she would go see Hall, and Hall would call C. Vega for instructions.

{34} Hall hired Defendant Brandon Roberts ("Roberts") in late August 2008 to help Bradley. Roberts received compensation as an employee of TAI from September 2008 through March 3, 2009, although Roberts was never formally added to TAI's payroll. Instead, Roberts received a 1099 income tax statement rather than being paid through TAI's payroll service as did other employees at the ECDC.

{35} While a TAI employee, Roberts also performed work for Hall and one or more of Hall's business entities (Jeff Hall Sports Sales Division and Jeff Hall Sports) through March 3, 2009, when C. Vega's brother, J. Vega, dismissed all TAI employees from the ECDC. Roberts continued to perform work for Hall after the closing. Plaintiff presented no credible evidence of the amount of time that Roberts spent performing work for Hall's business entities that were unrelated to TAI.

{36} According to Roberts, Jeff Hall Sports Sales Division and Jeff Hall Sports were entities used by Jeff Hall to facilitate and promote sales of "Elite" sporting apparel and equipment as well as other non-"Elite" products that Hall was authorized to sell. Roberts had access to the ECDC computers and recorded or facilitated entries for both TAI and one or more of the Hall entities in their respective books and records.

{37} At Hall's request, McKinney became an employee of TAI on January 2, 2009. At the time, McKinney owned Hawk Textiles, a fabric company that made military shorts. Before coming to TAI, McKinney had been in the textile business for many years and provided textile materials to customers who made athletic uniforms for all types of sports. McKinney was intimately familiar with the production of custom athletic uniforms, including the design, printing, and embroidering of uniforms. McKinney had also owned a softball team for which Hall played one season in 1998.

{38} During times relevant to this action, Defendant Rodney Walker ("Walker") worked for Hall and one or more of his entities, providing services related to sales of sporting apparel and equipment over the internet via E-bay, under the username "crestchargers13@yahoo.com." Walker had access to the ECDC's computers and conducted or recorded transactions on the books and records of the ECDC and other Hall entities. Walker attended only the first day of trial and did not testify.

{39} Defendant Caldwell was a part owner in C.H. & Sons and TKL. Although a counter-claimant with Hall for property seized by TAI on March 3, 2009, Caldwell acknowledged at trial that he had previously received all of his property from the ECDC Warehouse.

{40} Hall hired Defendant Shelly A. "Moe" Neal ("Neal") and Neal received compensation as an employee of TAI from at least August 27, 2007, through March 3, 2009. Neal worked in TAI's warehouse in sales and filled orders for shipping. Neal also performed services for the Bat-R-Up batting cage business that Hall installed on the premises of the ECDC warehouse. In addition, Neal occasionally worked for Hall and one or more of Hall's other business entities while an employee

of TAI. Neal borrowed $800 from TAI to purchase a motorized scooter. The debt was carried on the ECDC's books as an advance to Jeff Hall, but was repaid by Neal via payroll deduction through the TAI payroll account at $50 per pay period until paid in full. At the time of trial, Neal's financial obligation to TAI had been fully satisfied.

{41} Since at least 2006, Defendant Worth, a subsidiary of the Jarden Corporation, has been a national or international manufacturer and distributor of sporting goods, including the "Jeff Hall" signature series of softball bats. Worth employed Defendant Mike Cornell ("Cornell") as its regional sales representative between 2006 and 2009, for the territory including Gastonia, North Carolina. Cornell and Hall were friends during that time. By order dated June 3, 2010, the Court dismissed all of Plaintiff's claims against Defendants Worth and Cornell, without prejudice. Neither Worth nor Cornell participated in the trial.

{42} At its inception, TAI did not provide the ECDC with any office equipment. Hall provided a Gateway Laptop computer that was later determined to have a copy of TAI's QuickBooks program installed on it.

{43} Through C.H. & Sons' account, Hall purchased two computers, a printer, a router and office supplies for the ECDC. C.H. & Sons was fully reimbursed by TAI for these expenditures.

{44} In the January 2008, Hall informed Pat Morrow ("Morrow"), a local accountant who provided accounting services to C.H. & Sons, that C. Vega had requested the production of a balance sheet and profit and loss statement for the ECDC covering the period from March to December 2007 in order to consolidate the financials for the ECDC with TAI's financial records. According to Morrow, he knew from experience what was needed to prepare the documents and did not receive any input from Hall or Smith.

{45} Morrow was familiar with QuickBooks. He reviewed the QuickBooks program and information on Smith's computer, including a QuickBooks report and balance sheet from TAI. Morrow determined that the ECDC QuickBooks accounting was not good and contained mistakes and inaccuracies in inventory and

in accounts receivable. Morrow and Hall called C. Vega to communicate this information, and Morrow expressed to C. Vega his concerns about the records. C. Vega informed Morrow to contact TAI's accountant in California – the Baroldi firm – to work it out. Morrow called Baroldi and discussed with Baroldi the problems he had identified with the records. Morrow testified that he was told to do the best he could and send what he had, and that Baroldi would resolve any inventory problems in California.

{46} Morrow also noted, and informed Jason Bennett at the Baroldi firm, that the ECDC's cash flow was insufficient to pay the ECDC warehouse mortgage and other operating expenses. For the year ending December 31, 2007, the ECDC paid $47,133.01 from its account for the benefit of Vega Real Estate. Bennett directed Morrow to remove the mortgage expense from the ECDC balance sheet and Baroldi would take care of it in California.

{47} With the understanding derived from his discussion with Baroldi, Morrow made adjustments to sales in the amount of $165,989.32 in order to correct a corresponding but erroneous characterization of ECDC sales as inventory in the ECDC QuickBooks program. He also increased inventory by $11,708.00, and made journal entries, including moving $11,721.54 of inventory to sales and debiting inventory in the same amount, in order to produce a proper balance sheet and profit and loss statement for the ECDC. The Court does not find that these adjustments were made for the purpose of hiding sales as Plaintiff contends.

{48} Morrow also wrote off $47,133.01 in mortgage payments made by the ECDC for the benefit of Vega Real Estate, as instructed by Jason Bennett, because that was the amount Vega Real Estate should have been paying to the ECDC.

{49} After producing the balance sheet and profit and loss statement, Morrow transmitted it to the Baroldi firm in May 2008. According to Morrow, the numbers on the balance sheet were correct except for inventories because he could not make sense of inventories. Morrow also suggested to Hall that Hall hire Melissa Simons to provide QuickBooks training for Smith, and later for Bradley.

{50} For the 2008 ECDC QuickBooks, Morrow began adjusting inventory to zero at the end of each month because sales did not result in either a reduction in inventory or a credit to sales in the program. He took this course because the QuickBooks program was not working correctly, not to hide sales.

{51} Morrow returned to the ECDC in September 2008 and made the same adjustments that were made in 2007 to bring the inventory balance to zero. Hall was not aware of what Morrow was doing. Morrow made the entries in the course of providing professional services to TAI and the ECDC.

{52} In March 2007, Hall purchased polo shirts from Badger Sportswear to satisfy a TAI sponsorship obligation to USSSA. Hall paid $12,052.80 for the shirts using his own credit card. In May 2007, USSSA paid $24,023.60 to TAI for the shirts and Hall caused a check to be issued from the ECDC account in that amount to Hall. Hall maintains that he spoke with C. Vega about the arrangement and C. Vega agreed that all the profits from this transaction belonged to Hall because Hall made all the investment in locating and purchasing the shirts, getting them embroidered and having them shipped to USSSA. C. Vega contends that he knew about the sponsorship but did not know there would be profit from the shirts, and did not agree that Hall would take all the profits. Hall stipulates and agrees that he owes TAI a total of $3,810.00 ($3,000 for embroidery and $810 for freight) that TAI paid in connection with the transaction, and that Hall has not reimbursed TAI in that amount. The Court finds Halls position to be credible and resolves this conflict in testimony in favor of Hall.

{53} During the summer of 2008, Hall authorized the construction of batting cages in the ECDC warehouse space. Hall used his construction company to modify the space to accommodate the cages. C. Vega agreed with constructing the cages so long as they did not cost him anything, and once construction expenses had been recovered, TAI and Hall would split the proceeds from the use of the cages. While Hall derived some income from the use of the cages, Plaintiff's evidence failed to demonstrate the specific amount that was collected or whether amounts collected exceeded construction expenses.

{54} In August 2008, Hall built and paid for a showroom in the ECDC to display "Elite" and TAI products. Hall also displayed for sale his own personal signature bats. In addition, Hall added a boxing ring for his brother to use to offer boxing lessons at the facility.

{55} Hall entered into a sublease with the Lakhanys for space in Parcel A of the warehouse to operate C.H. & Sons. Hall told the Lakhanys that C. Vega had authorized the arrangement. The Lakhany's written lease with Vega Real Estate, however, did not permit subleasing. C.H. & Sons made significant alterations to Parcel A by enclosing a stairwell, installing a window and creating second floor offices to accommodate the construction company. C. Vega admits that Hall was authorized to use space in Parcel B for the benefit of C.H. & Sons, but that C. Vega would have objected to Hall subleasing space in Parcel A from the Lakhanys unless Hall gave him a valid reason for entering the sub-lease. Hall made his lease payments directly to the Lakhanys.

D.

JEFF HALL SPORTS

{56} Hall talked to Defendant McKinney about business opportunities for the "Elite" brand and about custom uniforms for TAI. At Hall's request, in October 2008, McKinney accompanied Hall to visit C. Vega in California. McKinney was present when Hall and C. Vega discussed starting Jeff Hall Sports Division under the umbrella of TAI. McKinney was convinced from the conversation between C. Vega and Hall that C. Vega did not care if there was a "Jeff Hall" line of clothing as long as C. Vega got a cut of the profits and the clothing had the "Elite" brand on it. According to McKinney, Hall and C. Vega intended the "Jeff Hall" line to compete against a company called "Boombah." During the meeting, C. Vega instructed Hall to consider hiring McKinney to source fabrics and garments.

{57} When McKinney and Hall returned to Gastonia, Hall offered McKinney employment with TAI and, with some conditions, McKinney accepted and was an employee of TAI from January 2009 until March 3, 2009, when J. Vega shut the doors and evicted all TAI employees from the ECDC. Hall informed McKinney that

Hall and C. Vega were going to try to make custom uniforms, and Hall told the ECDC employees that McKinney was going to help with the uniforms.

{58} McKinney and Hall had a conversation about the propriety of what Hall was proposing. McKinney explained to Hall that the only way he could do what he wanted was as a division of TAI. McKinney understood that Hall would not compete as a separate company with TAI. With that understanding, McKinney began working from a conference room on the premises of C.H. & Sons, set up a computer system to make "Jeff Hall" signature custom uniforms for TAI, and began ordering basic pants and shirts bearing the "Elite" logo from a company in the Dominican Republic.

{59} C. Vega wanted a special fabric developed for uniforms to replace the cotton material he was then using. McKinney arranged for the fabric to be produced in the Dominican Republic, ordered 1600 yards of the material and traveled to the Dominican Republic to accept delivery. McKinney returned to Gastonia on March 3, 2009, the day J. Vega shut down the ECDC. Between January 2, 2009, and March 3, 2009, McKinney observed that Hall and C. Vega had daily telephone conversations with each other.

{60} Hall also formed and incorporated Jeff Hall Sports, Inc. as a North Carolina Corporation on January 22, 2009, and thereafter purchased equipment with his own funds to be used in the business. Hall and C. Vega talked about a franchise for Hall, but the arrangement they settled on was more like a dealer, according to McKinney. Hall wanted to purchase TAI inventory and sell "Elite" product under his own name, like a franchise. Because Hall did not have any product inventory of his own, it was to his advantage to acquire products from TAI at wholesale prices and resell them at retail under the "Jeff Hall" line. Hall never arranged a franchise agreement with TAI for the sale or resale of TAI products before the ECDC was shut down on March 3, 2009.

{61} Hall used TAI employees to process sales of "Elite" merchandise through Jeff Hall Sports.

E.

EXPECT EVIDENCE

1.

PAUL PRECIADO

{62} Plaintiff called as one of its expert witnesses Mr. Paul Preciado ("Preciado") who was tendered and received as a CPA and Certified Fraud Examiner from California. Preciado conducted a forensic investigation of the year-end copy of QuickBooks records that Pat Morrow provided to the Baroldi Firm and participated in an inventory of merchandise at the ECDC warehouse. Based upon his investigation and analysis, Preciado prepared a final fraud examination report of Plaintiff's losses. In Preciado's opinion, Plaintiff sustained the following losses:

   a. Thirty-nine (39) check disbursements to Hall from ECDC's checking account that were not approved or authorized by C. Vega in the amount of $62,504.50;

   b. Deposits of TAI funds into a Worth account maintained by Hall in the amount of $22,047.00;

   c. Use of TAI's resources and client information to sell Worth products and embezzle TAI inventory in the amount of $54,216.00;

   d. Use of TAI assets and employees to promote Hall's personal business activities, at an estimated cost of $69,940.00, plus $27,000.00 in back rent for Bat-R-Up floor space, for a grand total of $96,940.00

   e. Missing, removed, or understated inventory from 2007 through 2009, in the amount of $858,481.00.

   TOTAL LOSSES: $1,094,188.50.

{63} In Preciado's expert opinion, the willful misappropriation of TAI's assets, willful manipulation of TAI's computer system, willful manipulation of TAI's sales transactions, and willful provision of misleading financial information to TAI's management constituted fraud.

{64} Preciado was introduced to C. Vega by Vince Baroldi, Plaintiff's bookkeeper, and was asked to meet J. Vega in Gastonia on March 8, 2009, to assist with an inventory of TAI merchandise at the ECDC. Preciado had available to him at that time a year-end copy of the ECDC QuickBooks records that Morrow provided to Baroldi after Morrow's year-end evaluation. The Court noted above the adjustments made by Morrow to the ECDC QuickBooks records that were forwarded to the Baroldi firm. Preciado used this version of QuickBooks to develop and confirm his opinion of loss amounts, including lost revenue from inventory pilferage and theft by Defendants in the amount of $497,898.00.

{65} With respect to loss item #1 above – 39 unauthorized checks – Preciado acknowledges and agrees that if Hall and C. Vega had an agreement that the checks would or could be issued, his loss computation of $62,504.50 would become zero.

{66} With respect to his allocation of employee expenses to Hall, Preciado acknowledges that $69,940.00 was merely an estimate and that he could not be precise about the amount without knowing the actual time the TAI employees spent on Hall's personal business interests. No evidence of the actual time TAI employees spent on Hall's unrelated business interests was presented during trial. And, the estimated back-rent attributed to Bat-R-Up is premised on Preciado's belief that C. Vega did not authorize Hall to install, and was unaware of the presence of, batting cages on the ECDC premises.

{67} The Court further notes that: (i) J. Vega informed Preciado that no one could give away or receive at no cost TAI products, including promotional items: (ii) Preciado was unaware that Jeff Hall was authorized to have and wear TAI promotional items at no charge to Hall, and for the foregoing reasons, Preciado held Hall accountable for all promotional items given away at no charge; (iii) Preciado was unaware that Jeff Hall or C.H. & Sons had an account with Worth to sell bats; (iv) Preciado was unaware of any oral agreement between C. Vega and Hall regarding the sale of bats; (v) Hall did not make entries in the ECDC QuickBooks after Smith began as office manager in March 2007; (vi) it was Preciado's

understanding that Morrow had made no "hard-coded" adjustments to the QuickBooks that Preciado used to arrive at his conclusions and opinions, notwithstanding the fact that the Baroldi firm had previously informed C. Vega about the "massive journal entries" that appeared in the QuickBooks records sent to Baroldi by Pat Morrow, and Baroldi wanted to know if the entries were authorized. C. Vega told him they were not; and (vii) that $497,898.00 attributed to losses from inventory irregularities are based upon profits TAI would have earned but for pilferage of inventory attributed to Defendants, and not from actual costs of goods to Hall.

{68} It appears to the Court that Preciado's report outlining the fraudulent and unlawful conduct of the Hall Defendants contains largely conclusive findings, and is based upon a significant lack of information about the relationship between C. Vega and Hall, and the journal entries made in the ECDC QuickBooks by Morrow.

{69} From Preciado's analysis and report, the Court is unable to determine with reasonable certainty what amounts of damages, if any, are reasonably attributable to the individual defendants.

2.

EDWARD P. BOWERS

{70} In addition to Preciado, Plaintiff offered the expert opinion of Edward P. Bowers ("Bowers"), a Certified Public Accountant, who is also certified in forensic accounting. Bowers was hired by Plaintiff to review the books and records of Plaintiff and the books and records of Defendants for the purpose of supplementing the report of Preciado. Among the many records that Bowers examined were the QuickBooks electronic data files for Jeff Hall Sports Sales Division.

{71} In Bowers' opinion, Plaintiff incurred the following losses:

a. $53,199.00 from the sale of Plaintiff inventory by Jeff Hall d/b/a Jeff Hall Sports Division,

b. $2,873.00 from the shipment of Plaintiff inventory sold by Jeff Hall d/b/a Jeff Hall Sports Division,

c. $51,678.00 from the sale and transfer of Plaintiff inventory to Jeffrey Hall and related parties, excluding Jeff Hall d/b/a Jeff Hall Sports Division, at less than value,

d. $8,397.00 from the sale and transfer of Plaintiff inventory to John Daniels a/k/a WSL, a/k/a WSL-World Softball League, a/k/a Long Haul Trucking, a/k/a WSL-Ebay at less than value,

e. $13,242.00 from the unauthorized transfer of Plaintiff funds to Jeffrey Hall.

f. $96,940.00 from the Defendants use of Plaintiff's employees and facilities, and

g. $497,898.00 from the loss of inventory.

TOTAL LOSSES: $728,688.00

Bowers' opinion regarding the losses associated with Hall's use of Plaintiff's employees and facilities, and with loss of inventory, is based upon the Fraud Examination Report of Preciado.

{72} The conclusions drawn by Bowers suffer from the same infirmities as those drawn by Preciado, i.e., his loss calculation is predicated on the assumption that there was no understanding between C. Vega and Hall by which Hall was authorized to give away TAI products for promotional purposes, utilize TAI employees and facilities, and resell TAI products via Jeff Hall Sales Division.

3.

KEVIN WALKER

{73} Defendant Hall called as his expert witness Mr. Kevin Walker, CPA and Certified Fraud Examiner ("Walker"). Walker based his opinion of losses upon the assumption that there existed an understanding between C. Vega and Hall that Hall was authorized to give away TAI products for promotional purposes, utilize TAI employees and facilities, and resell TAI products via Jeff Hall Sales Division.

{74} Based upon Walker's analysis, TAI suffered losses, but not for the reasons asserted by Plaintiff, as follows:

a. $11,730.00 from the sale of TAI Inventory by Jeff Hall Sports, Sales Division. This loss was premised upon unsatisfied payables related to products

purchased by Jeff Hall Sports from TAI that were accounted for in the ECDC QuickBooks.

b. $2,210.00 related to freight costs associated with Jeff Hall Sports transactions that were not paid by either TAI or Jeff Hall Sports, Sales Division.

c. $0 from the sale and or transfer of TAI inventory to Jeff Hall and related parties,

d. $0 from the sale and transfer of TAI inventory to WSL and related parties, and,

e. $4,461.00 from the unauthorized transfer of TAI funds to Hall. This amount was predicated upon a USSSA transaction involving non-TAI shirts that Hall obtained from Badger, Inc. and paid for himself. Hall acknowledged that he owed TAI $3,000.00 as reimbursement for embroidery applied to the shirts and freight costs in the amount of $810.00. From his review of the records, Walker determined that Hall owed an additional amount of $651.00 from the sale of 20 pairs of "Elite" brand pants.

TOTAL LOSS: $18,401.00.

{75} The Court finds Walker's analysis persuasive and adopts his assessment of Plaintiff's damages.

III.

CONCLUSIONS OF LAW

A.

PRELIMINARY AND PERMANENT INJUNCTION

{76} In its Complaint, Plaintiff asked the Court to issue a preliminary injunction to prevent Defendants from "further depleting or using TAI's resources for their personal use or the use of Defendant Hall and his various entities and aliases." (Am. Compl. ¶ 48.) Plaintiff also requested that at trial, a permanent injunction be issued to permanently enjoin the Defendants from selling, removing, or otherwise harming assets or property of TAI.

{77} By order issued on June 29, 2009, the Hon. Albert Diaz, Special Superior Court Judge for Complex Business Cases, denied Plaintiff's Motion for Preliminary Injunction and for the Appointment of a Receiver, finding, *inter alia*, that Plaintiff had not demonstrated irreparable harm. *TAI Sports, Inc.*, No. 09 CVS 2201 (N.C. Super. Ct. June 25, 2009) (order denying Plaintiff's motion for preliminary injunction).

{78} The case proceeded to trial and the Court heard eight weeks of evidence from the parties, including testimony that on March 3, 2009, J. Vega came to Gastonia, removed all ECDC employees from the work premises and took physical possession of the business and most, if not all, of its records. Defendants were not permitted to return to the premises or access any of TAI's business records or accounts thereafter.

{79} "It is well-settled law that where there is an adequate remedy at law, an injunction will not lie. This principle is applicable to all cases in which the complaining party can have adequate relief by the prosecution of his remedy in the courts . . . ." *Lewis v. Goodman*, 14 N.C. App. 582, 583, 188 S.E.2d 709, 710 (1972). Having already denied Plaintiff's motion for preliminary injunction, the only remaining question is whether Plaintiff is entitled to a permanent injunction. The Court concludes that after having had a full opportunity to prosecute its legal claims before this Court, Plaintiff has not presented any evidence to support its contention that a permanent injunction is warranted as a matter of law. Accordingly, Plaintiff's request for permanent injunctive relief is DENIED.

B.

DECLARATORY JUDGMENT

{80} "'The Declaratory Judgment Act[] affords an appropriate procedure for alleviating uncertainty in the interpretation of written instruments and for clarifying litigation.'" *Lynn v. Lynn*, 202 N.C. App. 423, 430, 689 S.E.2d 198, 204, *review denied*, 364 N.C. 613, 705 S.E.2d 736 (2010) (quoting *Hejl v. Hood, Hargett & Associates, Inc.,* 196 N.C. App. 299, 302, 674 S.E.2d 425, 427 (2009)). "Courts of record . . . shall have power to declare rights, status, and other legal relations . . .

[,]" N.C. Gen. Stat. § 1-253 (2011), at their discretion. *Id.* at § 1-257; *see also Augur v. Augur*, 356 N.C. 582, 585–87, 573 S.E.2d 125, 128–30 (2002) (adopting the abuse of discretion standard when reviewing a trial court's decision to decline a party's request for declaratory relief).

{81} A court should issue a declaratory judgment: "'(1) when [it] will serve a useful purpose in clarifying and settling the legal relations at issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding. When these criteria are not met, no declaratory judgment should issue.'" *Calabria v. N. Carolina State Bd. of Elections*, 198 N.C. App. 550, 554, 680 S.E.2d 738, 743 (2009) (quoting *Augur,* 356 N.C. at 588, 573 S.E.2d at 130) (alteration in original). Here, the resolution of Plaintiff's remaining claims by the entry of this Order obviates the need for the Court to further consider Plaintiff's claim for declaratory relief. Accordingly, Plaintiff's request for declaratory relief is DENIED.

## C.

### BREACH OF CONTRACT

{82} In its Complaint, Plaintiff alleged that Defendants breached an "oral and/or implied agreement with TAI, as well as [] numerous written contracts for the delivery and sale of goods to TAI's customers or potential customers." (Am. Compl. ¶ 65.)

{83} First, the Court finds that Plaintiff has failed to present credible evidence of the existence of an oral or implied agreement between any of the individual Defendants, other than perhaps Hall, to do anything beyond what is customary in a typical employer/employee relationship. Hall hired the individual Defendants to work as employees of the ECDC. The only agreement between the individual defendants and TAI were incidental to their employment relationship: each defendant agreed to work for TAI and TAI agreed to pay each defendant for their labors. Plaintiff does not allege that the individual Defendants failed to work for the wages they received as employees of the ECDC.

{84} Second, the alleged written contracts for the delivery and sale of goods to TAI's customers or potential customers were sales via invoices between TAI and its customers. If those invoices were in fact determined to be contracts, any claim of breach of contract for failure to deliver the ordered goods, would belong to the customer, not TAI.

{85} Lastly, C. Vega acknowledged during his trial testimony that, initially, Hall was not hired as an employee of TAI or the ECDC because C. Vega could not afford to pay Hall a salary. C. Vega contends that instead of becoming an employee, Hall agreed to operate and manage the ECDC in exchange for free TAI products to wear while promoting TAI, and the promise that TAI would bring Hall on as a full-time employee when C. Vega could afford to pay Hall a salary comparable to Hall's earnings from C.H. & Sons. According to C. Vega, this arrangement constituted the basis of the parties' agreement even though no specific duties were discussed for Hall as the manager of the ECDC.

{86} Hall, however, denies that he ever worked for TAI, received a salary from Plaintiff, or served as President of the ECDC. Hall asserts that he agreed to help C. Vega get TAI's sporting goods business underway on the east coast as a favor to C. Vega and that the only arrangement between the two was that in return for Hall allowing C. Vega to capitalize on Hall's popularity and name in the slow pitch softball profession, TAI would provide Hall with various products free of charge and allow Hall to sell Worth products through the ECDC. The parties never reduced any of their alleged agreements or understandings to writing.

{87} To establish a breach of contract, a plaintiff must demonstrate: "(1) existence of a valid contract and (2) breach of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (citing *Jackson v. California Hardwood Co.*, 120 N.C. App. 870, 871, 463 S.E.2d 571, 572 (1995)). A valid contract consists of a meeting of the minds and consideration. *Creech v. Melnik*, 347 N.C. 520, 527, 495 S.E.2d 907, 912 (1998). A meeting of the minds is established by mutual assent; substantiated "by an offer by one party and an acceptance by the other." *Id.* (citing *Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980)). "Consideration

'consists of any benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee.'" *Sessler v. Marsh*, 144 N.C. App. 623, 634, 551 S.E.2d 160, 167, *writ denied, review denied*, 354 N.C. 365, 556 S.E.2d 577 (2001) (quoting *Lee v. Paragon Group Contractors, Inc.,* 78 N.C. App. 334, 338, 337 S.E.2d 132, 134 (1985)). "A breach of contract occurs when a party fails to perform a contractual duty that has become [due]." *Salvaggio v. New Breed Transfer Corp.*, 150 N.C. App. 688, 692, 564 S.E.2d 641, 644 (2002) (citing *Millis Construction Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App. 506, 510, 358 S.E.2d 566, 569 (1987)).

{88} Based upon the evidence presented at trial, the Court concludes that Plaintiff has failed to show a meeting of the minds on any essential aspect of Plaintiff and Hall's business relationship sufficient for the Court to find the existence of a mutual understanding between those parties. Therefore, the Court concludes that a valid contract did not exist between Plaintiff and Hall, and as a result no breach could have occurred. Accordingly, the Court DENIES Plaintiff relief on its claim for breach of contract, as to Hall. The Court also concludes that the only contract between Plaintiff and the remaining Defendants would be based on their employer/employee relationship, and that Plaintiff did not prove by a preponderance of the evidence that any of the Defendants breached their employment contracts with Plaintiff. Therefore, the Court DENIES Plaintiff relief on this claim as to the remaining Defendants.

D.

FRAUD

{89} Establishing fraud requires a plaintiff to prove that the defendant made a "'(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which d[id] in fact deceive, (5) resulting in damage to the injured party.'" *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 609, 659 S.E.2d 442, 449 (2008) (quoting *McGahren v. Saenger*, 118 N.C. App. 649, 654, 456 S.E.2d 852, 855 (1995)).

{90} While Plaintiff's fraud claim is directed at each of the defendants, Plaintiff's only allege that Defendant Hall made specific misrepresentations or concealments. (Am. Compl. ¶ 69(a–n).) Plaintiff's evidence to support this claim was gleaned principally from the financial books and records of the ECDC.

{91} The facts of this case demonstrate that Hall sought the involvement of a disinterested CPA to review the ECDC QuickBooks records for the purpose of preparing and submitting to TAI's California office a financial statement to be used in preparing TAI's 2007 and 2008 year-end tax returns. From Plaintiff's experts' review of the ECDC QuickBooks, and from the testimony of Plaintiff's employees, entries were consistently made in the ECDC QuickBooks records for all transactions, including those between the ECDC and Jeff Hall Sports. Plaintiff's evidence fails to satisfy the Court that Defendants fraudulently transferred any of Plaintiff's assets to third parties, intentionally sought to conceal material facts or transactions from Plaintiff, or made material misrepresentations to Plaintiff upon which Plaintiff relied, or from which, upon reasonable inspection of the records, Plaintiff could not have discovered the truth.

{92} The Court notes that none of the employees of the ECDC, including Hall, had much, if any, familiarity with QuickBooks before becoming employees of TAI, and as a result, record keeping errors were likely to occur. The fact of the matter is that Plaintiff provided little, if any, training to the ECDC employees in QuickBooks management, warehouse management, or the normal business practices, policies and procedures of TAI. Plaintiff also failed to provide proper supervision of those employees to ensure compliance with its practices, policies, and procedures. All of those functions were left to the discretion of Defendant Hall, a soft-ball player and construction company owner.

{93} Further, without direction from any of the named Defendants, Pat Morrow made adjustments in inventory and journal entries for the purpose of producing a balance sheet and profit and loss statement that significantly impacted the information contained in the ECDC QuickBooks accounting records. And, even with

those adjustments, Mr. Morrow noted the system failed to accurately reflect inventories of the ECDC.

{94} The Court concludes that Plaintiff has failed to show that a fraudulent misrepresentation or concealment of material fact was made, or that any of the Defendants made any representations with the intent to deceive. The Court therefore DENIES Plaintiff relief on its claim for fraud.

E.

BREACH OF FIDUCIARY DUTY

1.

FIDUCIARY UMBRELLA

{95} "'For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744 (N.C. 2012) (quoting *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)). North Carolina courts have retained flexibility in imposing fiduciary duties where factually justified by declining to adopt an exact definition. *See Hajmm Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 588, 403 S.E.2d 483, 489 (1991) (citing *Abbitt v. Gregory,* 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)). Our Supreme Court in *Dalton v. Camp*, outlined a fiduciary relationship as one in which

> 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . , [and] it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.'

*Dalton*, 353 N.C. at 651–52, 548 S.E.2d at 707–08 (quoting *Abbitt*, 201 N.C. at 598, 160 S.E. at 906).

2.

BUSINESS PARTNER/CO-ADVENTURER

{96} Business partners owe each other a fiduciary duty as a matter of law. *Hajmm Co.*, 328 N.C. at 588, 403 S.E.2d at 489 (citing *Casey v. Grantham,* 239 N.C. 121, 79 S.E.2d 735 (1954)). A partnership can only be formed by an agreement.

*Potter v. Homestead Pres. Ass'n*, 330 N.C. 569, 576, 412 S.E.2d 1, 5 (1992). The agreement need not be express, and may be implied "upon a rational consideration of the acts and declarations of the parties, warranting the inference that the parties understood that they were partners and acted as such." *Eggleston v. Eggleston*, 228 N.C. 668, 674, 47 S.E.2d 243, 247 (1948) (citations omitted). The "hallmark of a partnership is the sharing of 'any profits, income, expenses, joint business property or hav[ing] authority of any kind over each other.'" *Azalea Garden Bd. & Care Inc. v. Vanhoy*, 2009 NCBC 8 ¶ 15 (N.C. Super. Ct. March 17, 2009), http://www.ncbusinesscourt.net/opinions/2009_NCBC_9.pdf (quoting *Wilder v. Hobson,* 101 N.C. App. 199, 203, 398 S.E.2d 625, 628 (1990)).

{97} There is no credible evidence before the Court that Defendant Hall and C. Vega agreed to share the profits, income, or expenses of TAI or the ECDC. Hall and C. Vega shared no joint business property, and by their behavior, neither appeared to have any authority over the other. Interpreted in a light most favorable to C. Vega, at best the relationship between Plaintiff and Hall might be characterized as one of joint venturers.

{98} A joint venture is essentially a partnership that is limited to a single endeavor or purpose, *compare Rhue v. Rhue*, 189 N.C. App. 299, 308, 658 S.E.2d 52, 59–60 (2008), *with Jones v. Shoji,* 336 N.C. 581, 585, 444 S.E.2d 203, 205 (1994). But, while partnerships and joint ventures are distinct relationships, under North Carolina law, "'they are governed by substantially the same rules.'" *Jones,* 336 N.C. at 585, 444 S.E.2d at 203 (quoting *Pike v. Trust Co.,* 274 N.C. 1, 9, 161 S.E.2d 453, 460 (1968)).

{99} For the same reasons set out above, the Court does not find that any of the indicia of a joint venture existed between TAI and Hall. In addition, the individual defendants were merely employees of Plaintiff and, therefore, are not partners of, or joint venturers with, Plaintiff.

3.

OFFICER IN A CORPORATION

{100} Officers of a corporation owe a fiduciary duty to the corporation. *Pierce Concrete, Inc. v. Cannon Realty & Constr. Co.,* 77 N.C. App. 411, 413–14, 335 S.E.2d 30, 31 (1985) (citing *Meiselman v. Meiselman,* 309 N.C. 279, 307 S.E.2d 551 (1985)). An officer of a corporation "with discretionary authority" must

> discharge his duties in good faith, conform to a reasonable standard of care, and act in a manner he reasonably believes is in the best interests of the corporation . . . . Additionally, in North Carolina, an individual may owe a fiduciary duty to the corporation if he is considered to be a *de facto* officer or director, with authority for tasks such as signing tax returns, offering major input as to the company's . . . operation, or managing the company.

*Kinesis Adver., Inc. v. Hill*, 187 N.C. App. 1, 15–16, 652 S.E.2d 284, 295 (2007) (internal citations omitted) (emphasis in original).

{101} There is ample evidence in the record from which the Court could conclude that Defendant Hall served as a *de facto* officer of Plaintiff. Hall managed the ECDC, he had authority to hire and fire employees, he signed checks for the company, he authorized and made purchases on behalf of the ECDC, he had and exercised discretionary authority over how much and to whom promotional products were made available. As such, Hall was obligated to discharge his duties in good faith and conform his actions to a reasonable standard of care. Hall contends that his actions and decisions were done with the full knowledge, authorization, and consent of C. Vega. While Hall and Vega disagree about the scope and extent of Hall's discretionary authority to act on behalf of Plaintiff's ECDC operation, the Court finds that Hall acted in what he reasonably believed to be the best interests of the ECDC, and therefore did not breach the duty of care owed to Plaintiff.

4.

EMPLOYEE RELATIONSHIP

{102} North Carolina courts have repeatedly held that "the broad parameters accorded the term [fiduciary duty] have been specifically limited in the context of employment situations[,] and [u]nder the general rule, 'the relation of employer and employee is not one of those regarded as confidential.'" *Dalton*, 353 N.C. at 652, 548 S.E.2d at 708 (quoting *King v. Atlantic Coast Line R.R. Co.,* 157 N.C. 44, 72 S.E.

801 (1911)). "Even when an employee is entrusted with substantial managerial authority, a fiduciary relationship will not exist absent evidence that such authority led . . . the employer [to become] subjugated to the 'improper influences or domination of [its] employee.'" *Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 NCBC 33 (N.C. Super. Oct. 19, 2007), http://www.ncbusinesscourt.net/opinions/ 101907 %20Order%20Webpage.pdf.

{103} As previously noted, the individual defendants were merely employees of TAI. The Court does not find that they exercised any domination or influence over the Plaintiff, and therefore the Court concludes that no fiduciary relationship existed in the employment relationship between Plaintiff and the individual defendants, with the exception of Hall. As to Hall, the Court concludes that Hall acted in what he believed to be the best interests of Plaintiff and therefore did not breach his duty to Plaintiff. Accordingly, the Court DENIES Plaintiff relief as to this claim.

F.

CONSTRUCTIVE TRUST IN FAVOR OF PLAINTIFF

{104} A constructive trust is "'imposed by courts . . . to prevent the unjust enrichment of the holder of title to, or of an interest in, property which [was] acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.'" *United Carolina Bank v. Brogan*, 155 N.C. App. 633, 636, 574 S.E.2d 112, 115 (2002). "A constructive trust does not arise where there is no fiduciary relationship and there is an adequate remedy at law." *Security Nat'l Bank v. Educators Mut. Life Ins. Co.*, 265 N.C. 86, 95, 143 S.E.2d 270, 276 (1965) (citing *Atkinson v. Atkinson,* 225 N.C. 120, 33 S.E.2d 666 (1945)).

{105} To recover through the imposition of a constructive trust, there must be facts and circumstances: "(1) which created the relation of trust and confidence, and (2) [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of

plaintiff." *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 647, 679 (1981) (quoting *Rhodes v. Jones*, 232 N.C. 547, 61 S.E. 2d 725 (1950)) (alteration in original).

{106} Having previously determined that no fiduciary relationship existed between Plaintiff and the individual employee-defendants, the Court also concludes that there was no relationship of trust or confidence between Plaintiff and the individual Defendants.

{107} Having concluded that Plaintiff had an adequate remedy of fraud against Hall, but that Hall acted in what he reasonably believed to be in the best interest of the ECDC, and therefore did not breach his fiduciary duty to Plaintiff or otherwise engage in fraudulent behavior with respect to Plaintiff, the Court DENIES Plaintiff relief as to this claim.

G.

CONVERSION OF CHATTEL

{108} "'The tort of conversion is an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" *Lake Mary L.P. v. Johnston*, 145 N.C. App. 525, 531, 551 S.E.2d 546, 552, *rev. denied*, 354 N.C. 363, 557 S.E.2d 539 (2001) (quoting *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)). At its core, conversion "is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner . . . ." *Id.* at 532, 551 S.E.2d at 552.

{109} If the deprivation occurs through a wrongful taking, the act of dispossession establishes a conversion, *Porter v. Alexander*, 195 N.C. 5, 7, 141 S.E. 343, 344 (1928), however, "'Where there has been no wrongful taking or disposal of the goods, and the defendant has merely come rightfully into possession and then refused to surrender them, demand and refusal are necessary to the existence of the tort.'" *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 310–11, 603 S.E.2d 147, 165 (2004), *cert. denied*, 359 N.C. 286, 610 S.E.2d 717 (2005). "Therefore, two essential elements are necessary in a claim for conversion: (1) ownership in the plaintiff, and (2) a wrongful deprivation by the defendant." *Bartlett Milling Co.,*

*L.P. v. Walnut Grove Auction & Realty Co., Inc.*, 192 N.C. App. 74, 86, 665 S.E.2d 478, 489, *cert. denied*, 362 N.C. 679, 669 S.E.2d 741 (2008) (citing *Lake Mary Ltd. P'ship.,* 145 N.C. App. at 532, 551 S.E.2d at 552).

{110} The uncontroverted evidence before the Court is that Defendants lawfully came into possession of the property at issue in this lawsuit. There is no evidence that Defendants wrongfully dispossessed Plaintiff of its property, but rather Plaintiff alleged that Defendants exercised the "right of control over . . . personal property belonging to Plaintiff by Defendants' unauthorized exclusion of Plaintiff from exercising their rights of ownership over their own property . . . ." (Am. Compl. ¶ 81.) Plaintiff does not allege that Defendants came into possession of the property unlawfully. As such, Plaintiff must also have alleged and proved at trial that Plaintiff made a demand on the Defendants and that Defendants refused to return the disputed property. There being neither allegation nor proof of demand by Plaintiff, and refusal by Defendants, to return property belonging to Plaintiff, Plaintiff's claim for conversion fails as a matter of law. Accordingly, the Court DENIES Plaintiff relief as to this claim.

H.

UNFAIR AND DECEPTIVE TRADE PRACTICES

{111} The Unfair and Deceptive Trade Practices Act is a distinct and independent claim "directed toward maintaining ethical standards in dealings between persons engaged in business and to promote good faith at *all levels* of commerce." *Bhatti v. Buckland*, 328 N.C. 240, 246, 400 S.E.2d 440, 444 (1991) (citing *United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F. Supp. 1041, 1046 (E.D.N.C. 1979)) (emphasis in original). "To prevail on a claim of unfair and deceptive trade practice a plaintiff must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 460–61, 400 S.E.2d 476, 482 (1991) (citing N.C. GEN. STAT. §§ 75-1.1, 75-16). "A practice is unfair when it offends established public policy, as well as when the practice is immoral, unethical,

oppressive, unscrupulous, or substantially injurious to consumers," *Mitchell v. Linville*, 149 N.C. App. 71, 74, 557 S.E.2d 620, 623 (2001) (quoting *Johnson v. Phoenix Mut. Ins.*, 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980)).

{112} "Whether an act or practice is unfair is determined on a case-by-case basis, and the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others." *Sunbelt Rentals, Inc. v. Head & Engquest Equip.,* LLC, 2003 NCBC 4 ¶ 264 (N.C. Super. Ct. May 2, 2003) http://www.nc businesscourt.net/opinions/2003%20NCBC%204.htm (citations omitted). "A trade practice is deceptive if it 'has the capacity or tendency to deceive.'" *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 61–62, 418 S.E.2d 694, 700 (1992) (internal quotations omitted). Whether a particular commercial act or practice constitutes an unfair or deceptive trade practice is a question of law. *Norman Owen Trucking, Inc. v. Morkoski*, 131 N.C. App. 168, 177, 506 S.E.2d 267, 273 (1998).

{113} A finding of liability on certain other causes of action, however, may constitute an unfair and deceptive trade practice as a matter of law so long as the offending conduct occurred in or affecting commerce. *See Bhatti*, 328 N.C. at 243, 400 S.E.2d at 442 (holding that fraud constitutes a *per se* violation of the UDTPA).

{114} As a general rule

> there is a presumption against unfair and deceptive practice claims as between employers and employees. Ordinarily, in such a context, the claimant must make a showing of business related conduct that is unlawful or of deceptive acts that affect commerce beyond the employment relationship. The rationale behind this general rule is that pure employer-employee disputes are not sufficiently 'in or affecting commerce' to satisfy the second element of a UDTPA claim.

*Gress v. Rowboat Co.*, 190 N.C. App. 773, 776–77, 661 S.E.2d 278, 281–82 (2008) (internal citations omitted).

{115} Given the Court's conclusion that the relationship between Plaintiff and the individual-employee Defendants was nothing more than that of employer and employee, Plaintiff has failed to satisfy the second element of a UDTPA claim against Traci Hall, Brandon Roberts, Traci Bradley, Dewey McKinney and Shelly

"Moe" Neal. As for Hall, the Court concludes that Plaintiff has failed to prove by the greater weight of the evidence that Hall himself engaged in any fraudulent, unfair, deceptive, or unlawful acts. As such, Plaintiff is not entitled to relief as to this claim.

I.

UNJUST ENRICHMENT

{116} Unjust enrichment has been defined as "a legal term characterizing the 'result or effect of a failure to make restitution of, or for, property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor.'" *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 179, 684 S.E.2d 41, 54 (2009) (quoting *Ivey v. Williams*, 74 N.C. App. 532, 534, 328 S.E.2d 837, 838–39 (1985)) (internal citation omitted).

{117} A claim for unjust enrichment is an equitable claim based on "quasi-contract" or a contract "implied in law," *Atlantic and East Carolina Ry. Co. v. Wheatley Oil Co.*, 163 N.C. App. 748, 753, 594 S.E.2d 425, 429 (2004), "to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *Collins v. Davis*, 68 N.C. App. 588, 591, 315 S.E.2d 759, 761 (1984). A court cannot imply a contract where an express agreement exists. *Whitfield v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998). Therefore, "[i]f there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988) (citing *Concrete Co. v. Lumber Co.*, 256 N.C. 709, 713–14, 124 S.E.2d 905, 908 (1962)).

{118} In order to recover on a claim for unjust enrichment, the evidence must show "(1) plaintiff conferred a measurable benefit to the defendant, (2) the defendant consciously accepted the benefit, and (3) the benefit was not conferred gratuitously or by an interference in the affairs of the defendant." *S.E. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002). A key element is that a benefit inure to the defendant. "Without enrichment, there can be

no 'unjust enrichment' and therefore no recovery on an implied contract." *Greeson v. Byrd*, 54 N.C. App. 681, 683, 284 S.E.2d 195, 196 (1995).

{119} As discussed above, Defendant Hall admits, and Defendants' expert confirms, that the following amounts are due Plaintiff: (a) $11,730.00 from the sale of TAI Inventory by Jeff Hall Sports, Sales Division; (b) $2,210.00 related to freight costs associated with Jeff Hall Sports transactions that were not paid by either TAI or Jeff Hall Sports, Sales Division; and (c) $4,461.00 from the unauthorized transfer of TAI funds to Jeffrey Hall for shirt embroidery, freight costs, and merchandise sales. Having found above that the evidence presented by Defendants' expert provided the only credible measure of loss suffered by TAI, the Court concludes that these amounts were not gratuitously conferred upon Hall and as a result, the total loss of $18.401.00 should be reimbursed to TAI by Hall.

J.

QUANTUM MERUIT FOR RENT ON IMPLIED LEASE

{120} Plaintiff has asserted claims against Defendants "for the reasonable value of the rent of Plaintiff's premises [at the ECDC], including the use of its building, grounds, equipment, goods, inventory, or services appurtenances and improvements, from early 2007 through March 2, 2009," upon the theory that Defendants knew or had reason to know that TAI expected to be paid. (Am. Compl. ¶¶ 98, 100). "*Quantum meruit* is an equitable principle that allows recovery for services based upon an implied contract." *Harrell v. Constr. Co.*, 41 N.C. App. 593, 595, 255 S.E.2d 280, 281 (1979). A court cannot imply a contract where an express agreement exists. *Whitfield*, 348 N.C. at 42, 497 S.E.2d at 415.

{121} In North Carolina, "[w]hen any person occupies the land of another by the permission of such other, without any express agreement for rent, . . . the landlord may recover a reasonable compensation for such occupation . . . ." N.C. GEN. STAT. § 42-4 (2012); *see also Raleigh-Durham Airport Auth. v. Delta Air Lines, Inc.*, 429 F. Supp. 1069, 1084 (E.D.N.C. 1976) (holding the airline's use of an airport can be considered an occupation of land for purposes of N.C. Gen. Stat. § 42-4).

{122} It is abundantly clear to the Court that Defendants occupied Parcel B of the ECDC premises not only with TAI's permission, but also for TAI's benefit. TAI offered into evidence the Lease Agreement between Vega Real Estate and TAI for both Parcel A and Parcel B. (Pl. Ex. # 151-E.) Parcel B was used by the ECDC to carry on TAI's sporting apparel distribution business. C. Vega does not dispute that Hall was welcome to use additional space in Parcel B for storage of construction materials and as an office for C.H. & Sons. C. Vega and Hall did not enter into a sublease for that purpose, however. Under these circumstances, TAI did not have a reasonable expectation of compensation from the Defendants for their use or occupation of Parcel B to carry on activities benefiting TAI.

{123} All parties agree that TAI leased Parcel A to the Lakhanys pursuant to a written sublease agreement. (Pl. Ex. # 151-C). The Lakhanys, therefore, were the lawful possessors of Parcel A. Although the Lakhany's sublease contained a provision restricting the subletting or assignment of any portion of Parcel A, without consulting C. Vega, the Lakhanys entered into a sublease with C.H. & Sons for upstairs space in Parcel A. Hall then made structural alterations to Parcel A to accommodate his business and made lease payments to the Lakhanys.

{124} The individual-employee defendants occupied both Parcel A and Parcel B pursuant to executed lease and sublease agreements, and Hall made lease payments pursuant to the sublease agreement between C.H. & Sons and the Lakhanys. On these facts, it would be manifestly unreasonable for TAI to expect additional payment from Defendants for the use and occupation of Parcel A or Parcel B.

{125} "Absent some evidence of an expectation of payment, there can be no recovery for *quantum meruit*." *JDH Capital, LLC v. Flowers*, 2009 NCBC 4 ¶ 50 (N.C. Super. Ct. Mar. 13, 2009), http://www.ncbusinesscourt.net/opinions/2009_NCBC_4.pdf. Accordingly, the Court DENIES Plaintiff relief on its claim for *quantum meruit* for rent on an implied lease.

K.

TRESPASS

{126}  Plaintiff's claim for Trespass is premised upon allegations that: (1) Defendants "purposely, intentionally, willfully, and by willful nondisclosure and/or deceit entered or caused entry onto the [ECDC] and have remained present upon the Plaintiff's property without authority since sometime in 2007" (Am. Compl. ¶ 103); (2) "Defendants' refusal to vacate, repeated entry and/or continued presence is and was unauthorized and without the consent of TAI, the lawful possessor" (Am. Compl. ¶ 104); and (3) "Defendants have refused to leave after being asked to do so and after having represented an intention to leave the premises." (Am. Compl. ¶ 104.)

{127}  "[T]respass is a wrongful invasion of the possession of another." *Singleton v. Haywood Elec. Membership Corp.,* 357 N.C. 623, 627, 588 S.E.2d 871, 874 (2003) (quotation and citation omitted).  Establishing a claim of trespass requires "(1) possession of the property by plaintiff when the alleged trespass was committed; (2) an unauthorized entry by defendant; and (3) damage to plaintiff." *Id.*.  A lawful entry may become a trespass if acts are undertaken in excess or in abuse of the lawful entry.  *Miller v. Brooks*, 123 N.C. App. 20, 27–28, 472 S.E.2d 350, 355 (1996) (citing *Blackwood v. Cates,* 297 N.C. 163, 167, 254 S.E.2d 7, 9 (1979)).

{128}  A trespasser is "liable for all damage proximately resulting from [the trespasser's] wrongful entry and, at least, for nominal damages." *Smith v. VonCannon*, 283 N.C. 656, 660, 197 S.E.2d 524, 528 (1973) (citation omitted).

{129}  For the reasons stated above, the Court finds that the Defendants entered the premises of Parcel B to carry on the business of TAI.  The individual defendants, with the exception of Hall, were employees of Plaintiff.  As such, all of the individual defendants' entries and continued presence upon the premises were both impliedly and actually consented to and authorized by Plaintiff.  The Court notes, however, "that a party's consent to another's entry onto his land does not insulate against liability for trespass when the other commits subsequent wrongful acts in excess or abuse of his authority to enter . . . ." *Keyzer v. Amerlink, Ltd.*, 173 N.C. App. 284, 290, 618 S.E.2d 768, 772 (2005).  In addition, a "[p]laintiff's consent to enter and remain on plaintiff's property [i]s voided when plaintiff's consent was

derived from defendant's repeated fraud and deceit." *Id.* at 296, 618 S.E.2d at 776 (citing *Blackwood*, 297 N.C. at 167, 254 S.E.2d at 9).

{130}  TAI presented no credible evidence that Defendants made specific misrepresentations, or engaged in acts of deception, to induce TAI to consent to Defendants' entry or continued presence in Parcel B of the ECDC.  Nor was there any evidence presented that, prior to March 9, 2009, TAI or its representative asked or directed Defendants to vacate, leave, or stay away from the ECDC premises. And, after being ejected on March 9, 2009, none of the Defendants returned to the premises.  With respect to Parcel B, there is no evidence that Defendants undertook any acts in excess or abuse of their lawful entry, and, therefore, no trespass occurred there.

{131}  The Court is left to determine whether Defendant Hall's access to, use, and occupancy of Parcel A amounted to a trespass of real property, from which TAI can recover.   As noted previously, TAI leased Parcel A to the Lakhanys under a written sublease agreement.  (Pl. Ex. # 151-C.)  The Lakhanys, therefore, were the lawful possessors of Parcel A.  Although the Lakhanys' sublease prohibited subletting or assignment of Parcel A without prior consultation of C. Vega, the Lakhanys entered into a sublease with C.H. & Sons for space in Parcel A, and Hall entered Parcel A with the Lakhanys' consent.  The question that the Court must resolve is whether Hall's representation to the Lakhanys that C. Vega consented to Hall's occupancy of Parcel A was either a misrepresentation or deception that might vitiate the Lakhanys' consent.  However, the Lakhanys are not parties to this action and, thus, have not raised the issue of deception or misrepresentation to void their consent to Hall's occupancy of Parcel A.  Therefore, the Court concludes that Plaintiff's claim as to Parcel A fails because the Lakhanys were the rightful possessors of Parcel A and the ones who were lawfully authorized to give consent to Hall's occupancy of Parcel A.

{132}  Plaintiff cites a North Carolina Supreme Court case, *McBryde v. Coggins-McIntosh Lumber Co.*, for the proposition that all defendants are jointly and severally liable for the trespass as aiders, abettors, or benefactors.  246 N.C. 415,

419, 98 S.E.2d 663, 666 (1957) (citing *Horton v. Hensley*, 23 N.C. 163, 166 (1840)). However, in light of the Court's determinations above that the claim for trespass fails, there is no joint and several liability of Defendants as aiders, abettors, or benefactors of trespass. For the foregoing reasons, the Court DENIES Plaintiff relief on its claim for trespass to land.

L.

TRESPASS TO PERSONAL PROPERTY

{133} A claim of trespass to personal property is based on the "injury to possession." *Fordham v. Eason*, 351 N.C. 151, 155, 521 S.E.2d 701, 704 (1999) (citation omitted). To satisfy a claim for trespass to personal property, the "plaintiff must demonstrate that [plaintiff] had[: (1)] either actual or constructive possession of the [personal property] in question at the time of the trespass, and [(2)] that there was an unauthorized, unlawful interference or dispossession of the property." *Kirschbaum v. McLaurin Parking Co.*, 188 N.C. App. 782, 786–87, 656 S.E.2d 683, 686 (2008) (internal quotation and citation omitted). "Actual damages, however, are not an element of trespass to [personal property]." *Id.*

{134} Actual possession is a fact and constructive possession is a legal fiction. *Fordham*, 351 N.C. at 155, 521 S.E.2d at 704. Actual possession is expressed through the exercise of dominion over or making ordinary use of the personal property, whereas constructive possession consists of a legal right to immediate actual possession. *Id.*

{135} It is uncontroverted that all the disputed property belonging to TAI was intentionally, knowingly, and voluntarily placed in Defendants' possession by TAI or its designated representative. The question for the Court to resolve is whether Defendants thereafter, without authority, interfered with or dispossessed TAI of that property by some artifice, fraud or ruse. Upon the facts presented, the Court simply cannot reach that conclusion. The Court has previously noted that Hall and C. Vega operated without the benefit of an agreement or mutual understanding regarding Hall's authority to act on behalf of TAI. Without such an agreement or understanding, or without a determination that Hall acted fraudulently, criminally

or in violation of a fiduciary duty, the Court cannot conclude that Hall acted without authority and unlawfully interfered with or dispossessed Plaintiff of its property. Therefore, the Court DENIES Plaintiff relief on its claim for trespass to personal property.

## M.

### CIVIL CONSPIRACY

{136} A conspiracy is generally defined as wrongful acts committed by persons pursuant to an agreement. *Dalton*, 138 N.C. App. at 213, 531 S.E.2d at 266.

{137} In North Carolina, no independent cause of action exists for civil conspiracy. *See Shope v. Boyer,* 268 N.C. 401, 404–05, 150 S.E.2d 771, 773–74 (1966). Therefore, recovery must be on the basis of an underlying claim of unlawful conduct. *Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002) (citing *Muse v. Morrison*, 234 N.C. 195, 198, 66 S.E.2d 783, 785 (1951)); *see also Dove v. Harvey*, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005) ("[R]ecovery must be on the basis of sufficiently alleged wrongful overt acts.") (quoting *Fox v. Wilson*, 85 N.C. App. 292, 301, 354 S.E.2d 737, 743 (1987)).

{138} To establish liability for a civil conspiracy a plaintiff must demonstrate, "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 72 (2008) (quotation and citation omitted); *see also State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 445, 666 S.E.2d 107, 116 (2008).

{139} The agreement to conspire may be established by sufficient circumstantial evidence, but the evidence must demonstrate more than mere suspicion of an agreement. *Boyd v. Drum*, 129 N.C. App. 586, 592, 501 S.E.2d 91, 96 (1998), *aff'd*, 350 N.C. 90, 511 S.E.2d 304 (1999) (citation omitted).

{140} Because damages in an action for civil conspiracy result from wrongful acts committed pursuant to the agreement, rather than from the agreement itself, the claimant must present evidence of an overt act committed by at least one

conspirator in furtherance of the common objective. *Jones v. City of Greensboro*, 51 N.C. App. 571, 583, 277 S.E.2d 562, 571 (1981), *overruled on other grounds by*, *Fowler v. Valencourt*, 334 N.C. 345, 435 S.E.2d 530 (1993).

{141} Plaintiff alleges that the agreement at the heart of the conspiracy was to "unlawfully occupy and convert the real and personal property of Plaintiff and to deprive, destroy or severely limit the manner in which Plaintiff was conducting business with TAI's customers, vendors, suppliers and other third parties . . . ." (Am. Compl. ¶ 35.) Plaintiff further alleges overt acts committed by Defendants in furtherance of the conspiracy including "the conversion of goods, services, equipment, utilities, supplies, customers, prospective customers, accounts, and premises . . . ." (Am. Compl. ¶ 38.)

{142} Having previously determined that Plaintiff has failed to prove the underlying claim for conversion of chattel, the Court considers whether a claim for conversion of customers, prospective customers, accounts and premises will lie in this case. However, "only goods and personal property are properly the subjects of a claim for conversion. A claim for conversion does not apply to real property." *Norman v. Nash Johnson & Sons' Farms, Inc.,* 140 N.C. App. 390, 414, 537 S.E.2d 248, 264 (2000) (citing *McNeill v. Minter*, 12 N.C. App. 144, 146, 182 S.E.2d 647, 648 (1971)). "Nor are intangible interests such as business opportunities and expectancy interests subject to a conversion claim." *Id.* (citation omitted). As intangibles and real property, customers, prospective customers, accounts and premises all fall outside the usual and customary meaning of "goods and personal property" and, thus, will not support a claim for conversion. Therefore, the Court concludes that Plaintiff failed to establish an underlying claim of unlawful conduct to support the alleged conspiracy. Accordingly, the Court DENIES Plaintiff relief on its claim for civil conspiracy.

N.

NUISANCE

{143} "In order to establish a claim for nuisance, a plaintiff must show the existence of a substantial and unreasonable interference with the use and

enjoyment of its property," *The Shadow Group, LLC v. Heather Hills Home Owners Ass'n*, 156 N.C. App. 197, 200, 579 S.E.2d 285, 287 (2003), that results in actual damage. *Hawkins v. Hawkins*, 101 N.C. App. 529, 533, 400 S.E.2d 472, 475 (1991), *aff'd*, 331 N.C. 743, 417 S.E.2d 447 (1992).

{144} The North Carolina Supreme Court has held substantial interference to mean "a substantial annoyance, some material physical discomfort . . . or injury to [the plaintiff's] health or property," *The Shadow Group, LLC*, 156 N.C. App. at 200, 579 S.E.2d at 287 (quoting *Duffy v. Meadows,* 131 N.C. 31, 34, 42 S.E. 460, 461 (1902)) (alteration original).

{145} A private nuisance may be classified as either per se or per accidens. *Morgan v. High Penn Oil Co.*, 238 N.C. 185, 191, 77 S.E.2d 682, 687 (1953). A nuisance per se is an act or structure that "is a nuisance at all times and under any circumstances," whereas a nuisance per accidens only becomes a nuisance in certain circumstances and under certain conditions. *Id.* "[A] lawful business may become a nuisance per accidens because of its operation or other factors." *Rudd v. Electrolux Corp.*, 982 F. Supp. 355, 368 (M.D.N.C. 1997) (referencing *Morgan*, 238 N.C. 185, 77 S.E.2d 682).

{146} Plaintiff alleges as the basis for its claim of nuisance that "Defendants substantially interfered with Plaintiff's use and enjoyment of its own property, which resulted in significant annoyance, material physical discomfort or injury and loss of rental income, profits, business and economic opportunity." (Am. Compl. ¶ 119.) In its ordinary meaning, a nuisance is "a condition, activity, or situation (such as a loud noise or foul odor) that interferes with the use or enjoyment of property." BLACK'S LAW DICTIONARY 1096 (8th ed. 2004). It stands to reason that to be compensable, a complainant must be aware of the "condition, activity or situation" of which he complains in order for it to interfere with his use or enjoyment of property. In this case, Plaintiff's evidence was that C. Vega did not become aware of the activities complained of until March 2009, and then promptly shut down operation of the ECDC. If a nuisance existed, it was abated when J. Vega arrived in Gastonia and dismissed all of the ECDC employees, including the individual

Defendants.  Plaintiff's annoyance with Defendants' conduct arose shortly before, contemporaneously with, or shortly after J. Vega shut down the ECDC. Considering the void of evidence in support of the claim for nuisance, it is unclear to the Court why Plaintiff pled this particular claim.  Regardless, Plaintiff has failed to prove the existence of either a nuisance per se or per accidens.  Accordingly, the Court DENIES Plaintiff relief on its claim for nuisance.

## O.
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AND PROSPECTIVE ECONOMIC ADVANTAGE

### 1.

### INTERFERENCE WITH BUSINESS RELATIONS

{147}  Our Supreme Court has used the term "business relationships" to embrace both tortious interference with contract and prospective economic advantage.  *Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, 2002 NCBC 4 ¶ 47 (N.C. Super. Ct. July 10, 2002), http://www.ncbusinesscourt.net/opinions/ 2002%20NCBC%204%20(Sunbelt).pdf  (discussing *Owens v. Pepsi Cola Bottling Co. of Hickory, N.C., Inc.*, 330 N.C. 666, 412 S.E.2d 636 (1992)).

{148}  To establish a claim for tortious interference with contract, the plaintiff must show:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988) (quoting *Childress v. Abeles*, 240 N.C. 67, 84 S.E.2d 176 (1954)).

{149}  Whether or not justification exists depends on "the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor, and the contractual interests of the other party." *Embree Const. Group, Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992) (quotation and alteration omitted).  In other words, justification exists where the interference is related to a

legitimate and lawful business interest.  *Fitzgerald v. Wolf*, 40 N.C. App. 197, 200, 252 S.E.2d 523, 524 (1979); *Childress*, 240 N.C. 667, 84 S.E.2d 176.

{150}  Plaintiff must first establish a valid contract between Plaintiff and a third-party.  Plaintiff presented virtually no evidence of the existence of a contract between Plaintiff and a third-party, except perhaps with respect to its relationship with Worth.  Based on the testimony of C. Vega, the Court finds that during the time period that Hall managed the ECDC, TAI purchased a substantial number of bats, presumably through contract, from third-party Worth.  However, at the time Plaintiff met Hall, Hall had an existing contractual relationship with Worth.  There is no evidence before the Court that anything Hall did interfered with Plaintiff's relationship with Worth, and having previously concluded that Defendant Hall acted in what he believed to be the best interest of TAI and the ECDC, the Court now concludes that Hall acted with justification in his interactions with existing customers of TAI.  While Plaintiff has presented evidence that it had supplier-customer relationships with a number of other individuals and entities, it has failed to satisfy the Court that any of those relationships were encumbered, interrupted, or altered by Hall's behavior.  Accordingly, Plaintiff is not entitled to relief upon its claim for tortious interference with business relations, and this claim is hereby DISMISSED.

2.

INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

{151}  A claim for tortious interference with prospective advantage requires a plaintiff show that the defendant "induced a third party to refrain from entering into a contract with the Plaintiff without justification."  *DaimlerChrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002).  The plaintiff must identify a specific potential contract and establish that the contract would have ensued but for the interference.  *Id.*

{152}  The North Carolina Supreme Court has held unjustified interference to be "not in the legitimate exercise of defendant's own right, but with design to injure the plaintiff, or gaining some advantage at his expense."  *Owens*, 330 N.C. at 680,

412 S.E.2d at 644 (quoting *Coleman v. Whisant*, 225 N.C. 494, 506, 35 S.E.2d 647, 656 (1945).

{153} Like Plaintiff's claim for tortious interference with business relations, the Court cannot find any credible evidence that either identifies the "specific potential contract" or demonstrates that the identified contract would have ensued but for the Defendants' actions. The only contract Plaintiff specifically identifies is its existing relationship with Worth, and, as stated above, none of the evidence presented suggests that Defendant Hall unjustifiably interfered with that relationship. In addition, the Court finds no evidence that Defendants induced any other third parties to refrain from entering into a contract with Plaintiff. As such, Plaintiff is not entitled to relief based on its claim for tortious interference with prospective economic advantage.

P.

PUNITIVE DAMAGES

{154} The award of punitive damages is controlled by statute. N.C. GEN. STAT. § 1D-1 (2012). These damages are not compensatory in nature, but rather, intended to deter future bad behavior by punishing a defendant for aggravating conduct in the commission of a tort. *Rhyne v. K-Mart Corporation*, 149 N.C. App. 672, 678, 562 S.E.2d 82, 88 (2002), *aff'd*, 358 N.C. 160, 594 S.E.2d 1 (2004). "The claimant must prove the existence of an aggravating factor by clear and convincing evidence. N.C. GEN. STAT. § 1D-15(b) (2012).

{155} Aggravation is defined as a wrong "done willfully or under circumstances of rudeness, oppression, or express malice, or in a manner evincing a wanton and reckless disregard of the plaintiffs' rights." *Connelly v. Family Inns of Am., Inc.,* 141 N.C. App. 583, 593, 540 S.E.2d 38, 44–45 (2000) (citation omitted). "An act is willful when there exists a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, a duty assumed by contract or imposed by law[,]" *Id.* at 593, 540 S.E.2d at 45 (internal quotation omitted), and "[a]n act is wanton when it is done of wicked purpose or when done

needlessly, manifesting a reckless indifference to the rights of others." *Id.* at 593, 540 S.E.2d at 45 (quotation omitted).

{156} Punitive damages are not awarded for a breach of contract, N.C. Gen. Stat. § 1D-15(d), without an identifiable independent tort and aggravating circumstances. *Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp.,* 15 F.3d 327, 331 (4th Cir. 1994) (citing *Newton v. Standard Fire Ins. Co.,* 291 N.C. 105, 229 S.E.2d 297, 301 (1976) and *Asheville Contracting Co. v. City of Wilson,* 62 N.C. App. 329, 303 S.E.2d 365, 373 (1983)). *See also Stanback v. Stanback,* 297 N.C. 181, 254 S.E.2d 611 (1979), *distinguished on other ground by Dickens v. Puryear,* 302 N.C. 437, 276 S.E.2d 325 (1981).

{157} When awarding punitive damages, the fact finder may only consider:

> a. The reprehensibility of the defendant's motives and conduct. b. The likelihood, at the relevant time, of serious harm. c. The degree of the defendant's awareness of the probable consequences of its conduct. d. The duration of the defendant's conduct. e. The actual damages suffered by the claimant. f. Any concealment by the defendant of the facts or consequences of its conduct. g. The existence and frequency of any similar past conduct by the defendant. h. Whether the defendant profited from the conduct. i. The defendant's ability to pay punitive damages, as evidenced by its revenues or net worth.

N.C. GEN. STAT. § 1D-35 (2011).

{158} Having considered the relevant factors, and previously concluded that the Defendants did not engage in unlawful, deceptive, or fraudulent conduct, the Court further concludes that Defendants did not deliberately fail to discharge a duty owed to Plaintiffs and, therefore, Plaintiff is not entitled to punitive damages.

Q.

DEFENDANTS' COUNTERCLAIMS/CROSS-CLAIMS

{159} Defendants Worth and Cornell filed counterclaims against Plaintiff TIA and cross-claims against C. Vega. By order dated June 9, 2010, the Court dismissed without prejudice Worth and Cornell's counterclaims against Plaintiff, however, no dismissal was entered, or other disposition made, with respect to Worth and Cornell's cross-claims against C. Vega. Because their cross-claims were not

prosecuted during the trial of this case, the Court concludes that these claims should be DISMISSED for failure to prosecute.

{160} By way of Counterclaim, Jeff Hall, C.H. & Sons, TKL, Jeff Hall Sports and Caldwell ("Counterclaimants"), asserted claims for (a) conversion of repairs and improvements made by C.H. & Sons and TKI at the ECDC, and for recovery of items of personal property, including cash, in the amount of $74,672.98; (b) the repayment of loans from Hall to C. Vega and TAI totaling $3,124.00; (c) defamation;[3] (d) breach of contract; (e) quantum meruit (alternatively); (f) claim and delivery; (g) trespass to chattels; (h) declaratory judgment; and (i) tortious interference with contract.

{161} By order of the Honorable Albert Diaz, *TAI Sports, Inc. v. Hall*, No. 09 CVS 2201 (N.C. Super. Ct. July 22, 2009) (order granting application for claim and delivery), possession of the personal property claimed by Counterclaimants was returned to them upon the posting of bond with the Gaston County Clerk of Court in the amount of $108,944.00. Having resolved all other issues between the parties in this Order, the Court concludes that Counterclaimants are entitled to permanent possession of the items returned to them in Judge Diaz's order, and are further entitled to the release of their $108,944.00 bond.

{162} As to the remaining counterclaims, the Court can not find that any credible evidence was produced sufficient to support the remaining claims and accordingly the remainder of Counterclaimants claims are DISMISSED.

IV.

CONCLUSION

{163} The Court has both personal and subject matter jurisdiction over the parties and claims, respectively.

{164} Plaintiff is not entitled to a permanent injunction as a matter of law.

{165} The resolution of Plaintiff's claims by trial and the Court's conclusion that no valid contract exists between the parties obviates the need for the Court to resolve Plaintiff's claim for declaratory relief.

---

[3] Counterclaimants claim for defamation was voluntarily dismissed on March 30, 2011.

{166} No valid contract existed between Plaintiff and Defendants. Absent a valid contract, there could be no breach.

{167} Plaintiff has failed to sustain its burden of proof with respect to its claim for fraud.

{168} No fiduciary relationship existed between Plaintiff and the individual employee-defendants. Defendant Hall served as a *de facto* officer of Plaintiff and owed Plaintiff a duty of care. However, the Court concludes that Hall acted in what he reasonably believed to be the best interest of the ECDC, and therefore did not breach the duty of care owed to Plaintiff.

{169} Plaintiff's claim for imposition of a constructive trust is without merit.

{170} With respect to its claim of conversion, Plaintiff did not present any evidence of demand by Plaintiff, and refusal by Defendants, to return property that Plaintiff entrusted to Defendants.

{171} With respect to Plaintiff's UDTPA claim, the relationship between Plaintiff and the individual-employee defendants was nothing more than that of employer and employee and, therefore, the actions of these defendants are not "in or affecting commerce."

{172} Plaintiff has failed to prove by a preponderance of the evidence that Defendant Hall engaged in any fraudulent, deceptive or unlawful acts which proximately caused actual injury to the plaintiff or to its business.

{173} With respect to Plaintiff's Unjust Enrichment claim, Plaintiff conferred a measurable benefit upon Hall in the amount of $18,401.00 that was not gratuitous and for which Plaintiff is entitled to reimbursement.

{174} Plaintiff has failed to prove the existence of an implied lease.

{175} Plaintiff has failed to prove by a preponderance of the evidence its claim for Trespass in Count 12 of the Amended Complaint.

{176} With respect to its Conspiracy claim, Plaintiff has failed to prove by a preponderance of the evidence the object of the alleged conspiracy in Count 14 of the Amended Complaint.

{177} Plaintiff has failed to prove any element of its claim for Nuisance.

{178} Plaintiff has failed to prove its claim for Tortious Interference with Business Relations by a preponderance of the evidence, and there is no credible evidence before the Court to support a claim of tortuous interference with prospective economic advantage.

{179} Plaintiff has failed to prove by a preponderance of the evidence that Defendants engaged in aggravating conduct in the commission of a tort to warrant punitive damages.

## V. JUDGMENT

IT IS, THEREFORE, ORDERED, ADJUDGED and DECREED as follows:

{180} Plaintiff's claim for permanent injunctive relief is DENIED.

{181} Plaintiff's claim for declaratory relief is DENIED.

{182} Plaintiff is not entitled to relief on its claim for breach of contract.

{183} Plaintiff is not entitled to relief on its claim for fraud.

{184} Plaintiff is not entitled to relief on its claim for breach of fiduciary duty.

{185} Plaintiff is not entitled to relief on its claim for imposition of a constructive trust.

{186} Plaintiff is not entitled to relief on its claim for claim for conversion.

{187} Plaintiff is not entitled to relief on its claim for claim for UDTP.

{188} Upon its claim for unjust enrichment, Plaintiff shall have and recover of Defendant Jeffrey Hall the sum of $18,401.00, plus interest at the legal rate accumulated from the date of the Complaint. As to the remaining Defendants, Plaintiff is not entitled to relief.

{189} Plaintiff is not entitled to relief on its claim for quantum meruit.

{190} Plaintiff is not entitled to relief on its claim for trespass.

{191} Plaintiff is not entitled to relief on its claim for trespass to personal property.

{192} Plaintiff is not entitled to relief on its claim for civil conspiracy.

{193} Plaintiff is not entitled to relief upon its claim for nuisance.

{194} Plaintiff is not entitled to relief on its claims for tortious interference with business relations, or tortious interference with prospective economic advantage.

{195}  Plaintiff is not entitled to relief on its claim for punitive damages.

{196}  Worth and Cornell's cross-claims against C. Vega are DISMISSED.

{197}  Counterclaimants shall have permanent possession of the items delivered to them by virtue of Judge Diaz's order of possession, and their bond in the amount of $108,944.00 is hereby RELEASED.

{198}  Counterclaimants Jeff Hall, C.H. & Sons, TKL, Jeff Hall Sports, Inc. and Caldwell's claims for (a) Conversion of repairs and improvements made by C.H. & Sons and TKI at the ECDC warehouse, and for the recovery of other items of personal property, including cash, in the amount of $74,672.98 and (b) the repayment of loans from Hall to C. Vega and TAI totaling $3,124.00; (c) breach of contract; (d) quantum meruit (alternatively); (e) claim and delivery; (f) trespass to chattels; (g) declaratory judgment; and (h) tortious interference with contract are DISMISSED.

{199}  Each party, respectively, shall bear his/her own costs of this action.

SO ORDERED, this the 28th day of December 2012.